USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 6/26/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP,

      Plaintiff,

-against-

PREMIER CAPITAL, LLC and PREMIER CAPITAL, INC.,

      Defendants.

15-cv-08293 (ALC) (AJP)

<u>OPINION AND ORDER</u>

**ANDREW L. CARTER, JR., United States District Judge:**

  Plaintiff Riker, Danzig, Scherher, Hyland & Peretti ("Riker"), a law firm, brings this action against its former clients, Defendants Premier Capital, LLC and Premier Capital, Inc. (together, "Premier"), to collect attorneys' fees allegedly earned during the course of a number of representations. Premier, in turn, asserted several counterclaims against Riker, of which only its breach of contract claim remains. Presently before the Court is Riker's motion for summary judgment on its causes of action for *quantum meruit* and an account stated. Riker also seeks summary judgment in its favor on Premier's breach of contract counterclaim. For the reasons that follow, Riker's motion is granted in part and denied in part.

## BACKGROUND

### I. Factual Background

  For a number of years, Riker provided legal services to Premier in mortgage foreclosure and debt collection-related litigation in state and federal court in the New York metropolitan area. The representations that form the basis of this lawsuit began in May 2012 with a New York State Court foreclosure action, the "DNR Matter." ECF No. 72 (Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl's 56.1 Stmt.")), at ¶ 27; ECF No. 71

(Declaration of Jonathan P. Vuotto ("Vuotto Decl.")), Ex. 59 (Email Correspondence dated May 2-June 14, 2012). In connection with the DNR Matter, Riker sent Premier a retainer letter dated June 18, 2012, which Premier returned executed on June 29. Vuotto Decl., Ex. 51 (DNR Retainer). The letter provides that it "will set forth the basic terms of our engagement and summarize our billing practices." *Id.* With respect to billing practices, Premier agreed to pay a blended rate of $325 per hour for Riker's attorneys. *Id.* The following month, Riker provided a "preliminary budget estimate" for the DNR Matter of $11,225 to $17,525. Vuotto Decl., Ex. 52 (DNR Budget). In the budget, Riker stated that it is "an estimate only and not a guaranty that (i) any specific amount of time will be spent on any given task or (ii) the fees or expenses for such tasks will not exceed the estimates." *Id.* Riker also noted that certain contingencies were not incorporated into the budget which could lead to "additional fees and expenses." *Id.*

Nothing in either the retainer letter or the budget for the DNR Matter provided Premier with the right to pre-approve tasks outside of the budget. However, in the cover letter accompanying Premier's retainer deposit, Premier stated that "[w]e will need to discuss any issues or strategic moves that will entail substantial legal expense in advance." ECF No. 76 (Affidavit of Richard Gleicher ("Gleicher Aff.")), Ex. B (Letter dated July 24, 2012). Premier also explained that it would pay all "reasonable" legal fees "provided that Premier specifically authorizes the work on the specific matter." *Id.* Premier further stated that Riker "agrees to notify and get Premier's written approval in advance when the collection strategy changes or is anticipated to exceed the Fee Schedule." *Id.* Premier had provided a similar letter to Riker previously in connection with a matter that is not the subject of this suit. ECF No. 80 (Defendants' Response to Pl's 56.1 Stmt. ("Defs' 56.1 Stmt.")), at ¶¶ 52-53; Gleicher Aff., Ex. A (Letter dated Oct. 14, 2011).

Between May 2012 and September 2015, Riker sent Premier 24 invoices for services related to the DNR Matter, totaling $66,996.97. Pl's 56.1 Stmt. ¶ 29. Premier admits that it received some, but not all, of Riker's invoices, but does not specify which invoices it did not receive. Defs' 56.1 Stmt. ¶ 29. Premier paid Riker $56,500.35, leaving $10,496.62 outstanding under these invoices. Pl's 56.1 Stmt. ¶ 30; Vuotto Decl., Exs. 53-58 (DNR Invoices).[1] In June and July of 2015, Riker emailed Premier regarding its outstanding invoices on the DNR Matter. Vuotto Decl., Ex. 60 (Email Correspondence dated June 16-July 15, 2015). On June 16, Riker noted that Premier had $9,315.08 outstanding and asked to have "payment made as soon as possible." *Id.* Riker reiterated its request for the payment of open invoices again on June 26 and July 15. *Id.* Premier responded to Riker's emails, which also included a discussion of the substance of the DNR Matter, but did not address the open invoices. *Id.*

At approximately the same time that Premier engaged Riker on the DNR Matter, it also engaged Riker on the "State Taub Matter." Pl's 56.1 Stmt. ¶ 1. In connection with this representation, Riker also sent Premier a retainer letter dated June 18, 2012, which is, in relevant part, identical to the DNR Matter retainer letter. Vuotto Decl., Ex. 7 (Taub Retainer Letter). Riker also provided Premier with a "preliminary budget estimate" for the Taub Matter of between $16,525 and $26,775 which contained the same disclaimers as the DNR budget estimate. Vuotto Decl., Ex. 8 (State Taub Budget). There is no record of Premier sending a cover letter with its retainer deposit as it did for the DNR Matter.

Between June 2012 and September 2015, Riker sent Premier 30 invoices detailing the services provided and the amounts owed, totaling $92,740.56. Pl's 56.1 Stmt. ¶ 4. Again, Premier states that it did not receive all 30 invoices and disputes the amount owed thereunder.

---

[1] The sum of the unpaid invoices in the DNR Matter is $10,496.**58**, not $10,496.**62**. The source of the typographical error in Riker's Rule 56.1 Statement is not clear.

3

Defs' 56.1 Stmt. ¶ 4. In any event, Premier paid $70,939.48, leaving $21,801.08 outstanding. Pl's 56.1 Stmt. ¶ 5; Vuotto Decl., Exs. 9-16 (State Taub Invoices); Gleicher Aff. ¶ 50. In June and July of 2015, Riker followed up with Premier regarding its outstanding invoices, but to no avail. Vuotto Decl., Ex. 17 (Email Correspondence dated June 22-July 15, 2015). Richard Gleicher, Premier Capital, LLC's Vice President, testified that he believed John Cummings, also a Vice President at Premier Capital, LLC, objected to Riker's bills by email, but there are no such emails in the record. Gleicher Aff., Ex. V (Transcript of Richard Gleicher Deposition ("Gleicher Dep.")), at 17:12-18:9. Gleicher also recalled objecting to a particular charge in the State Taub Matter related to an automatic stay. *Id.* 26:3-27:5. Premier now also contends that it objected by withholding payment on this and all other matters. Defs' 56.1 Stmt. ¶¶ 8-9.

Riker also represented Premier in a related federal bankruptcy court action, the "Federal Taub Matter," beginning in November 2012. Pl's 56.1 Stmt. ¶ 10. In connection with this representation, the parties apparently did not enter into a new retainer agreement nor did Riker provide Premier with a separate budget. Gleicher Aff. ¶ 48. Between November 2012 and June 2014, Riker sent Premier ten invoices in the Federal Taub Matter, totaling $25,173.79. Pl's 56.1 Stmt. ¶ 12. As with the State Taub Matter, Premier asserts that it did not receive every invoice, but does not identify which invoices are missing. Defs' 56.1 Stmt. ¶ 12. In connection with the Federal Taub Matter, Premier paid $7,731.31, leaving $17,442.48 unpaid under the invoices. Pl's 56.1 Stmt. ¶ 13; Vuotto Decl., Exs. 20-23 (Federal Taub Invoices); Gleicher Aff. ¶ 50. In December 2014, Riker followed up with Premier regarding the invoices outstanding for the Federal Taub Matter, among others, and Gleicher responded to say that he would let the firm know "if there are any problems." Vuotto Decl., Ex. 24 (Email Correspondence dated Dec. 4-8, 2014). Nothing in the record suggests that he did so.

4

During this same time period, Premier retained Riker to defend it in a Fair Debt Collection Practices Act lawsuit in New Jersey, the "Dunn Matter." Pl's 56.1 Stmt. ¶ 19; Gleicher Aff. ¶ 62. While, in its Amended Complaint, Riker alleges that it provided Premier a retainer letter for the Dunn Matter, there is no letter in the record. See ECF No. 8 (Am. Compl.), at ¶ 45. Riker did not provide a written budget, but Vuotto orally provided a budget estimate to Premier, with Premier contending the budget was between $15,000 and $20,000. Gleicher Aff., Ex. W (Letter from Premier dated Aug. 29, 2013); Vuotto Decl., Ex. 45 (Letter from Riker dated Sept. 4, 2013); Gleicher Aff., Ex. U (Transcript of Jonathan P. Vuotto Deposition ("Vuotto Dep.")), at 53:13-54:14 (acknowledging that he provided "rough estimate" orally). In connection with the Dunn Matter, Riker sent Premier 18 invoices, totaling $99,167.91, and Premier paid $24,841.35, leaving $74,326.56 outstanding. Pl's 56.1 Stmt. ¶¶ 20-22; Vuotto Decl., Exs. 25-37 (Dunn Invoices). As with the other matters, Premier admits that it received some, but not all, of Riker's invoices. Defs' 56.1 Stmt. ¶ 20.

In July 2013, the parties emailed back and forth regarding the implementation of a payment plan to resolve the outstanding invoices in the Dunn Matter. Pl's 56.1 Stmt. ¶ 23; Vuotto Decl., Exs. 40-41 (Email Correspondence dated July 15-31, 2013). Premier expressed its willingness to pay pursuant to a payment plan, and the parties continued to negotiate the contours of that plan. *Id.* During approximately the same time period, on August 29, 2013, in response to a letter from Riker dated August 22, Premier explained that the fees incurred up to that point were "far too and unacceptably high," and suggested that they "settle on a more equitable sum for [Riker's] legal services, in keeping with Jon [Vuotto's] budget." Pl's 56.1 Stmt. ¶ 24; Gleicher Aff., Ex. W (Letter from Premier dated Aug. 29, 2013). Premier had not made any complaints regarding the cost of the Dunn Matter prior to this. By October 2013, the parties had

agreed to a payment plan in which Riker would reduce its bills by $10,000 in exchange for an upfront payment by Premier and pre-arranged monthly payments thereafter. Vuotto Decl., Exs. 46 (Email Correspondence dated Oct. 3-4, 2013). It is not clear whether Premier complied with any part of this payment plan, but Riker continued to work on the Dunn Matter through August 2014. Pl's 56.1 Stmt. ¶ 20.

Premier also retained Riker to represent it in a bankruptcy matter in the Southern District of New York, the "Gasson Matter." Pl's 56.1 Stmt. ¶ 35. While Riker contends that this engagement began in December 2012, nothing in the record confirms that date. *Id.* Rather, it appears that the engagement commenced in May 2013, when Riker first sent Premier a "preliminary budget estimate." Defs' 56.1 Stmt. ¶ 35; Vuotto Decl., Ex. 63 (Gasson Budget); Gleicher Aff., Ex. I (Transcript of J. Alex Kress Deposition ("Kress Dep.")), at 40:9-21. The record does not contain a retainer letter for the Gasson Matter.

The budget estimate contains the same disclaimers as in the other budgets as well as some disclaimers specific to the Gasson Matter. Vuotto Decl., Ex. 63 (Gasson Budget). In it, Riker states that it will bill using a blended rate of $350 per hour given the complexity of the bankruptcy matter. *Id.* Riker estimated the budget as between $40,900 and $71,700, barring certain specified contingencies. *Id.* Between August 2013 and June 2015, Riker sent Premier 20 invoices in the Gasson Matter, totaling $118,551.36. Pl's 56.1 Stmt. ¶ 37. As with the other matters, Premier asserts that it did not receive every invoice, but does not identify the missing invoices. Defs' 56.1 Stmt. ¶ 37. In connection with the Gasson Matter, Premier paid $44,483.98, leaving $74,067.38 outstanding. Pl's 56.1 Stmt. ¶¶ 38-39; Vuotto Decl., Exs. 64-69 (Gasson Invoices); Gleicher Aff. ¶ 40.

Beginning in late May 2015, Riker began asking Premier to pay the outstanding invoices in the Gasson Matter. Pl's 56.1 Stmt. ¶ 40; Vuotto Decl., Ex. 70 (Email Correspondence dated May 28-June 4, 2015). Gleicher first responded that he would "check on the invoices," and the following week stated that he had a "few questions," which apparently led to a telephone conversation between Gleicher and Joseph Schwartz, an attorney at Riker. Vuotto Decl., Ex. 70 (Email Correspondence dated May 28-June 4, 2015); Gleicher Aff. ¶ 25. On June 4, 2015, Premier emailed Riker to express frustration with the billing. Specifically, Gleicher stated that "[y]esterday for the first time you provided your revised estimate of the case[.] It [is] 5 times higher than your low end estimate and 4 times higher than your high end estimate. . . . What we do not understand is what happened in this case." Gleicher Aff., Ex. O (Email Correspondence dated June 4, 2015). He further stated that, if Riker was not able to continue litigating the Gasson Matter within the parameters of the original budget estimate, Riker should "preserve [Premier's] rights until [Premier] can arrange substitute counsel." *Id.* Over the ensuing two weeks, the parties traded some rather contentious emails. Vuotto Decl., Exs. 71-72 (Email Correspondence dated June 3-18, 2015). Riker explained the increased fees as a result of difficulties during discovery and suggested that Premier was aware of, and approved, the additional work required. *Id.* Premier responded that it did not understand Riker's explanation. *Id.* Prior to this email correspondence, Premier had not objected to any of the invoices in the Gasson Matter. Pl's 56.1 Stmt. ¶¶ 40-41.

The final representation at issue in this action is the "Roche-Kelly Matter," another bankruptcy proceeding in the Southern District of New York. *Id.* ¶ 45. Premier retained Riker on the Roche-Kelly Matter in November 2013. *Id.* The parties did not sign a retainer letter in connection with the Roche-Kelly Matter nor did Riker provide a written budget. From

December 2013 through May 2015, Riker sent Premier 13 invoices, totaling $24,887.36. *Id.* ¶ 47. As with all of the other matters, Premier asserts that it did not receive every invoice, but does not identify which invoices it is missing. Defs' 56.1 Stmt. ¶ 47. Premier paid Riker $11,489.42 in connection with the Roche-Kelly Matter, leaving $13,397.95 outstanding under the invoices. Pl's 56.1 Stmt. ¶¶ 48-49; Vuotto Decl., Exs. 73-76 (Roche-Kelly Invoices).[2] In April 2015, in connection with discussing whether to move to reopen the bankruptcy case, Premier expressed frustration at what it felt was a lack of litigation strategy. Gleicher Aff., Ex. H (Email Correspondence dated Apr. 8-10, 2015). While Premier did not object to any expenses incurred through that date, Gleicher stated that "we can't authorize any actions without knowing what we are going to do (a plan), how much is it going to cost, how long is it going to take and how likely we are to succeed." *Id.*

## II. Procedural History

Riker initiated this action in October 2015. ECF No. 1. In its Amended Complaint, Riker asserted 18 causes of action: *quantum meruit*, account stated, and unjust enrichment with respect to each of its engagements, except the Dunn Matter, for which it asserted a breach of contract claim instead of *quantum meruit*. ECF No. 8 (Am. Compl.). Premier answered the Amended Complaint and asserted various counterclaims. ECF No. 29 (Am. Answer). As a result of Riker's motion to dismiss those counterclaims, the Court dismissed all but Premier's cause of action for breach of contract. ECF No. 60 (Opinion and Order).

While the motion to dismiss was pending, the parties engaged in discovery. Following the completion of discovery, Riker filed the instant motion for summary judgment. In it, Riker

---

[2] Riker correctly calculates the sum of the unpaid invoices in the Roche-Kelly Matter, but that amount plus Premier's alleged $11,489.42 payments is $24,887.37 not $24,887.36. The source of the typographical error in Riker's Rule 56.1 Statement is not clear.

8

seeks summary judgment in its favor on its *quantum meruit* and account stated causes of action only. It also seeks summary judgment on Premier's breach of contract counterclaim. *See* ECF Nos. 67 (Motion), 68 ("Pl's Memo."), 69 (Declaration of Christel Rueckemann-Jones ("Rueckemann-Jones Decl.")), 71 (Vuotto Decl.), 72 (Pl's 56.1 Stmt.). Premier opposed the motion, but did not argue that it is entitled to summary judgment in its favor on the breach of contract counterclaim. *See* ECF No. 75 ("Defs' Memo."), 76 (Gleicher Aff.), 77 (Affidavit of Thomas H. Curran), 80 (Defs' Rule 56.1 Stmt.). Riker submitted its reply brief in December 2016, and the Court considers the motion fully submitted. ECF No. 81 ("Pl's Reply").

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case under governing law. *Id.* at 248. An issue of fact is "genuine" when a reasonable finder of fact could render a verdict in favor of the nonmoving party based on the record as a whole. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In deciding a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *accord Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (court's role "is to identify factual issues, not to resolve them") (citation and internal quotation marks omitted).

9

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) (citation omitted). In opposing the motion, the non-moving party "may not rest upon the mere allegations or denials of his pleading." *Liberty Lobby*, 477 U.S. at 248 (citation and internal quotation marks omitted). Rather, he must "must set forth specific facts showing that there is a genuine issue for trial," *id.*, which must be "admissible in evidence," Fed. R. Civ. P. 56(c)(4). "[C]onclusory statements, conjecture, and inadmissible evidence" will not defeat a motion for summary judgment. *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir. 2007) (citation omitted).

## DISCUSSION

### I. Plaintiff's Cause of Action for an Account Stated

Riker seeks summary judgment in its favor on an account stated with respect to all of the engagements at issue in this case. "An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due." *Evolution Markets, Inc. v. Alpental Energy Partners, LLC*, No. 16-cv-1478 (CM), 2016 WL 6906714, at *8 (S.D.N.Y. Nov. 16, 2016) (quoting *Jim-Mar Corp. v. Aquatic Const., Ltd.*, 195 A.D.2d 868, 869 (3d Dep't 1993)) (internal quotation marks omitted).[3] To recover on an account stated, a plaintiff must prove that "(1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the amount stated." *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)

---

[3] None of the retainer letters includes a choice of law provision, and the parties have assumed, without argument, that New York law applies to their common law causes of action. Generally, in a diversity action such as this one, a court will apply the choice of law rules of the forum state. *GlobalNet Financial.com., Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006). "Under New York law, in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." *McKenzie v. Fishko*, No. 12-cv-7297 (LTS) (KNF), 2015 WL 685927, at *6 n.4 (S.D.N.Y. Feb. 13, 2015) (quoting *Mentor Ins. Co. v. Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993)) (internal quotation marks omitted). Accordingly, the Court will apply New York common law to the claims and counterclaims at issue in this motion.

(citation and internal quotation marks omitted). Here, the Court finds that, based on the record presented, Riker has not proven its entitlement to an account stated as a matter of law.

As a preliminary matter, to establish an account stated, the plaintiff must prove that the defendant actually received the bills. *IMG Fragrance Brands*, 679 F. Supp. 2d at 411; *see also United Capital Funding Corp. v. N.Y. City Dep't of Educ.*, 457 F. App'x 53, 55 (2d Cir. 2012) ("party who receives an account . . . is bound to examine it and, if the party agrees that the account is correct, it becomes an 'account stated' and is binding on both parties"). Riker has not offered evidence that Premier received any or all of the relevant invoices. Instead, Riker argues that it is entitled to the presumption that Premier received its invoices based on the testimony of its Legal Billing Coordinator, who describes the firm's procedures for creating and mailing invoices. Pl's Memo. at 4-5 (citing Rueckemann-Jones Decl.).

In New York, the presumption that an item mailed was received by the addressee can be established "by either proof of actual mailing or proof of a standard office practice or procedure designed to ensure that items are properly addressed and mailed." *Residential Holding Corp. v. Scottsdale Ins. Co.*, 286 A.D.2d 679, 680 (2d Dep't 2001). Where a party relies on testimony regarding standard office procedures rather than proof of the specific mailings, the office procedures must be "geared so as to ensure the likelihood that a [letter] is always properly addressed and mailed." *Progressive Cas. Ins. Co. v. Infinite Ortho Prods., Inc.*, 127 A.D.3d 1050, 1051 (2d Dep't 2015) (citing *Nassau Ins. Co. v. Murray*, 46 N.Y.2d 828, 830 (1978)). Once the presumption is established, a party may rebut that presumption by showing that "routine office practice was not followed or was so careless that it would be unreasonable to assume that [the letter] was mailed." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597

F.3d 84, 92 (2d Cir. 2010) (quoting *Nassau Ins. Co.*, 46 N.Y.2d at 830) (internal quotation marks omitted).

Here, Rueckemann-Jones' declaration focuses on Riker's standard practices rather than proof of actual mailing.[4] However, she has not provided enough information regarding Riker's standard practices to create a presumption of receipt by Premier. Accordingly, it does not matter that Premier's evidence and arguments on this point would have failed to rebut any presumption that arose.[5] Rueckemann-Jones, who was one of Riker's Legal Billing Coordinators during the relevant time period, describes the firm's "standard office procedure" for generating and mailing client invoices. With respect to mailing the invoices, she explains that invoices are sent with a cover letter in an envelope "on which the postal addresses are generated straight from the cover letter for the particular client and client matter." Rueckemann-Jones Decl. ¶ 10. The envelopes are then placed into the "outgoing bin," where mail room workers retrieve them and "bring[] the envelopes down for pick up by a postal service." *Id.* ¶¶ 12-13. This description provides no detail regarding how, if at all, this practice is "geared so as to ensure the likelihood that a [letter] is always properly addressed and mailed." *Progressive Cas. Ins.*, 127 A.D.3d at 1051 (no presumption arose where no explanation as to how "envelopes were addressed so as to ensure that the address was correct" or "how and when the envelopes, once sealed, weighed, and affixed with postage . . . were transferred to the care and custody of the [postal service]"); *cf. Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993) (plaintiff conceded receipt of some, but not all, letters

---

[4] The record suggests that Riker emailed at least some of the unpaid invoices directly to Premier, which could be evidence of actual mailing and receipt; however, the emails Riker includes in support of its motion do not contain the relevant attachments, making it impossible for the Court to conclude which invoices Premier received.

[5] Should Riker present more evidence at trial regarding their office practices, Premier's unsupported assertion that it did not receive all of Riker's invoices will be insufficient to rebut any presumption of receipt that arises. *See Ma*, 597 F.3d at 92. Premier has not identified which of the invoices it did not receive nor has it argued that Riker failed to follow its ordinary office procedures. *See* Defs' 56.1 Stmt. ¶¶ 4, 12, 20, 29, 37, 47; Gleicher Dep. 16:18-17:6 (discussing State Taub Invoices).

mailed to same address which bolstered inference of receipt); *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 321 (S.D.N.Y. 2009) (testimony regarding automated process "may be insufficient to show that [office's] practice would make delivery likely," but record also showed that missing statements were labelled with same address as those plaintiff conceded he received). For instance, Rueckemann-Jones does not explain how the address on the cover letter is generated or whether anyone confirms its accuracy. Without testimony regarding the accuracy of the address on the cover letter, the fact that the same address appears on the envelope cannot lead to a presumption of receipt.

Having failed to demonstrate that there is no genuine issue of material fact regarding Premier's receipt of all relevant invoices, Riker's motion for summary judgment on its account stated claims is denied and the Court need not reach the other elements of the cause of action.

## II. Plaintiff's Cause of Action for *Quantum Meruit*

Riker also seeks summary judgment in its favor on its *quantum meruit* claims arising out of the DNR, Taub, Gasson, and Roche-Kelly Matters. *Quantum meruit* is a quasi-contract doctrine. To recover under this theory, New York law requires the plaintiff to establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citation and internal quotation marks omitted). Premier takes issue with Riker's proof on each of the elements and, as a threshold matter, argues that *quantum meruit* is not appropriate because there was a written contract between the parties.

First, Premier is correct that a party may not recover under *quantum meruit* "if the parties have a valid, enforceable contract that governs the same subject matter as the *quantum meruit*

claim." *Mid-Hudson*, 418 F.3d at 175 (citing, *inter alia*, *Clark-Fitzpatrick, Inc. v. Long Is. R. R. Co.*, 70 N.Y.2d 382, 388 (1987)). However, here, there is no dispute that the Roche-Kelly and Gasson Matters were not governed by a retainer letter or any other written agreement.[6] Premier argues that "there undoubtedly was a contract for an attorney-client relationship between the parties in each of the matters in question," but has not presented any such contracts for the Court's review. Defs' Memo. at 22. This unsupported claim is not sufficient to raise a genuine issue of material fact. In the absence of evidence of any contracts for the Roche-Kelly or Gasson Matters, recovery under a *quantum meruit* theory is appropriate.

With respect to the DNR and Taub Matters, for which there are retainer letters in the record, Riker argues that it nevertheless can maintain a *quantum meruit* claim because (1) one court in this District allowed an attorney to recover from his client for non-payment of fees under both contract and *quantum meruit* theories; and (2) the retainer letters do not govern the dispute here, Premier's failure to pay Riker's attorneys' fees. Pl's Reply at 7. Regarding Riker's first argument, the single decision cited, *Carey v. Mui-Hin Lau*, 140 F. Supp. 2d 291 (S.D.N.Y. 2001), is not binding on this Court nor does the decision cite *Clark-Fitzpatrick* or any subsequent decisions on the propriety of *quantum meruit* where a contract also exists between the parties. *See Clark-Fitzpatrick*, 70 N.Y.2d at 388 ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *accord Ritz v. Mike Rory Corp.*, No. 12-cv-0367 (JBW) (RML), 2014 WL 7010661, at *3 (E.D.N.Y. Aug. 28, 2014) ("[A]bsent a retainer

---

[6] On reply, Riker asserts that there were no signed retainer letters for the Roche-Kelly and *Dunn* Matters. Pl's Reply at 7. Reference to the Dunn Matter here, and elsewhere in Riker's briefs, rather than the Gasson Matter, appears to be a typographical error given that Riker alleges the existence of a retainer letter for the Dunn Matter and has asserted a corresponding breach of contract claim, not *quantum meruit*. *See* Am. Compl. ¶¶ 45, 137-43. Moreover, there is no retainer letter governing the Gasson Matter in the record. *See* Vuotto Decl. ¶¶ 75-87.

agreement, an attorney may recover legal fees in *quantum meruit*."). Other courts in this Circuit seem to be in agreement; *Carey* has never been cited for the proposition that Riker offers it.

Riker's argument that the extant retainer letters do not cover this dispute also is without merit. Riker does not articulate why its claims should not be governed by the retainer letters, and a review of the letters makes it clear that the fee dispute here is, in fact, covered. The retainer letters in the DNR and Taub Matters each state that Riker's "fees will be based on the time that [its] attorneys and paralegals spend performing services on Premier Capital's behalf. For this matter, our hourly rate for all attorneys will be $325.00 per hour and fees for paralegals will be between $120.00 and $175.00 per hour. Bills will be sent monthly." Vuotto Decl., Exs. 7 (Taub Retainer), 51 (DNR Retainer). By signing these retainer letters and returning them to Riker, Premier agreed to pay Riker's monthly bills at the stated rates. Their failure to do so is the basis for Riker's claims.[7]

Therefore, Riker may proceed on its *quantum meruit* claims only with respect to the matters for which there were no retainer letters between the relevant parties. Genuine issues of material fact preclude summary judgment in Riker's favor, however. While, as discussed further below, there may not have been a contractual agreement between the parties that Premier's approval was required before Riker provided legal services outside the scope of the estimated

---

[7] An issue the parties have not raised, but which could potentially affect the outcome of Riker's *quantum meruit* claims, is the relationship between Premier Capital, Inc. and Premier Capital, LLC. *See, e.g., Ritz*, 2014 WL 7010661, at *2-3 (noting that attorney could recover under *quantum meruit* or account stated against non-parties to retainer agreement where attorney provided related legal services to those parties as well). The retainer letters in the record for the Taub and DNR Matters are between Riker and Premier Capital, LLC. *See* Vuotto Decl., Exs. 7 (Taub Retainer), 51 (DNR Retainer). The invoices are addressed to Premier Capital, LLC, as well. However, certain documents in the record reflect that each entity owned different claims. *See* Gleicher Aff., Exs. X (Email Correspondence dated Sept. 6, 2012) (explaining that Dunn Matter is owned by Premier Capital, Inc.), AA (Email Correspondence dated Sept. 13, 2015) (noting that West Hills and Dunn Matters are "two separate matters owned by different entities"). By contrast, in its Amended Answer, Premier alleges that both entities "engaged Riker" to litigate the cases at issue. Am. Answer ¶ 66. In its Amended Complaint, Riker alleges facts suggestive of an attempt to pierce the corporate veil, but has not sought to do so. Am. Compl. ¶¶ 47-51.

budgets, there are facts in the record that suggest this nevertheless was the parties' understanding. *See, e.g.*, Gleicher Aff., Exs. A (West Hills Retainer) (requesting that Premier must "specifically authorize[] the work on the specific matter" and that Riker "agrees to notify and get Premier's written approval in advance when the collection strategy changes or is anticipated to exceed the Fee Schedule"), B (DNR Retainer) (same); H (Email Correspondence dated Apr. 10, 2015) (noting that Premier "can't authorize any actions without knowing what we are going to do"); Vuotto Decl., Ex. 72 (Email Correspondence dated June 17, 2015) (noting "[t]hat is why [Premier] require[s] estimates and notice when things go sideways").

Riker disputes this characterization, and also argues that Premier was kept up to date on the progress of each of the cases at issue here. Pl's Reply at 7-8; *see also, e.g.*, Vuotto Dep. 43:2-45:19, 101:16-102:11. It therefore is necessary for the factfinder to determine which parties' version of the relationship is the accurate one. The answer to this question may be determinative of Premier's arguments that Riker did not perform services outside of the budget in good faith and could not have expected payment for those services, and that Premier automatically refused to accept any services outside of the budget, any of which could preclude judgment in Riker's favor on its *quantum meruit* claims. *See* Defs' Memo. at 22. Therefore, Riker's motion for summary judgment on its *quantum meruit* causes of action is denied.[8]

### III. Defendants' Counterclaim for Breach of Contract

Finally, Riker has moved for summary judgment in its favor on Premier's breach of contract counterclaim. In New York, to prove a cause of action for breach of contract, a party must demonstrate: "(1) a contract; (2) performance of the contract by one party; (3) breach by

---

[8] Riker also sought summary judgment on the question of its entitlement to prejudgment interest on its account stated and *quantum meruit* claims. Given that the Court has not granted summary judgment to Riker on these causes of action, it is premature to decide the propriety of prejudgment interest on any eventual recovery.

the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000) (citation and internal quotation marks omitted). "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999). For the reasons that follow, the Court will, in large part, grant Riker's motion for summary judgment on Premier's breach of contract claim.

Throughout the course of this litigation, it has been unclear precisely which contracts Premier contends that Riker breached, and how. Premier's breach of contract counterclaim consists entirely of the following allegations:

> [Premier] engaged Riker to handle the Taub, DNR, Gasson, Roche-Kelly and Dunn matters subject to budgets and other terms and conditions, including that any tasks and fees outside the budgets be pre-authorized by Premier. Riker breached these agreements by performing work that was unauthorized by [Premier] and then billing for it, as well as by billing [Premier] for amounts that far exceeded the budgets presented by Riker, against without pre-authorization or approval by Premier. As a result of these breaches, [Premier has] suffered and continue[s] to suffer damages.

Am. Answer ¶¶ 66-68. In the counterclaim, Premier does not specify which "agreements" Riker breached. *Id.* In opposing Riker's motion for summary judgment, Premier provides no further clarity. *See* Defs' Memo. at 4 ("[A] contract existed between the parties, as evidenced by the ongoing attorney-client relationship . . . ."). The best the Court can glean from Premier's pleading and arguments in opposition to the motion for summary judgment is that it believes Riker breached unspecified agreements by performing unauthorized work, charging fees "far beyond the scope of the budgets involved," and obtaining "poor results" in their cases. *Id.*

Based on the Court's review of the record, there are three categories of documents that Premier could be relying on as the "contracts" at issue: the retainer letters, budget estimates, and Premier's cover letter with the retainer deposit for the DNR Matter. Premier does not identify

17

any oral contracts between the parties that were breached by Riker. Where, as here, the written agreements—to the extent they are agreements at all—are unambiguous, the Court decides the meaning of the documents as a matter of law. In doing so, "matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument." *Terwilliger*, 206 F.3d at 245. The Court will address each category of document in turn.

First, nothing in the retainer letters, the only agreements in the record that, on their face clearly evidence "a manifestation of mutual assent" between Riker and Premier, requires Riker to seek pre-approval before performing certain tasks, charge legal fees within a particular budget, or guarantees a particular legal result. *See* Vuotto Decl., Exs. 7 (Taub Retainer), 51 (DNR Retainer). Accordingly, to the extent Premier was attempting to prove a breach of the retainer letters, they have failed to do so.

Second, the budget proposals are not contracts that bind Riker to charge Premier only the estimated amount. Each budget states that it "is an estimate only and not a guaranty that (i) any specific amount of time will be spent on any given task or (ii) the fees or expenses for such tasks will not exceed the estimates." Vuotto Decl., Exs. 8 (State Taub Budget), 52 (DNR Budget), 63 (Gasson Budget). While the record is somewhat unclear on the oral budget for the Dunn Matter that Vuotto apparently relayed to individuals at Premier, there seems to be no question that it, too, was an estimate. Gleicher Aff., Ex. W (Letter dated Aug. 29, 2013); Vuotto Dep. 53:13-54:14 (describing conversation as "rough estimate"), 162:3-11. Premier concedes that there is a difference between an "estimate" and a "guarantee." Gleicher Dep. 27:9-20. Riker billing Premier more than the estimated amounts cannot constitute a breach of these non-binding

18

proposals. That Riker may have understood Premier wanted to stay within the budget for each case does not mean that Riker was contractually bound to do so. *Cf.* Defs' Memo. at 4-6.

Third, and finally, Riker cannot be bound broadly by Premier's request, in connection with the DNR Matter, "to discuss any issues or strategic moves that will entail substantial legal expense in advance" and for Riker "to notify and get Premier's written approval in advance when the collection strategy changes or is anticipated to exceed the Fee Schedule." Gleicher Aff., Ex. B. On its face, this letter relates only to the DNR Matter. Contrary to Premier's argument, there is nothing in the record to suggest that the parties understood its terms would govern any other representations that Riker undertook on Premier's behalf. *See* Defs' Memo. at 7 ("From these initial dealings, Riker was put on notice for subsequent matters . . . .").

As it relates to the DNR Matter, however, the record contains sufficient evidence to find that, by accepting Premier's accompanying retainer deposit and subsequent payments, Riker accepted the terms of this letter. It is "standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) (collecting cases and secondary sources). Rather than argue that it was not bound by the terms of this letter or was unaware of the relevant terms, Riker argues that it complied with those terms. *See* Vuotto Dep. 101:16-102:11, 113:11-117:8. Premier disagrees. Gleicher testified that he was kept informed regarding the progress of the Taub and Roche-Kelly Matters only. Gleicher Dep. 38:9-21, 60:22-61:24. Riker's compliance, or lack thereof, with the terms of this letter during the course of the DNR Matter therefor remains a genuine issue of material fact precluding summary judgment on Premier's breach of contract claim.

## CONCLUSION

For all of the foregoing reasons, Riker's motion for summary judgment is granted in part and denied in part. The Court grants summary judgment to Riker on Premier's breach of contract claim, except as to the DNR Matter, and denies Riker's motion for summary judgment on its account stated and *quantum meruit* causes of action. The Court will hold a status conference on July 27, 2017 at 10:00 a.m. The parties (and/or counsel) should appear in person in Courtroom 1306 at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York, on the date and time specified.

**SO ORDERED.**

Dated: June 26, 2017
New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**